UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT FLORES,

        Plaintiff,

v.                                         Case No. 06-C-0003

NANNETTE HEGERTY[1], Chief of Police
for the City of Milwaukee, et al.,

        Defendants.

**MEMORANDUM DECISION AND ORDER**

Plaintiff Robert Flores is a state prisoner presently serving a sentence for two counts of felony murder. On January 3, 2006, Flores filed this *pro se* civil rights action under 42 U.S.C. § 1983 against several City of Milwaukee police officers who participated in his arrest and interrogation. In his amended complaint, Flores claims that the defendants violated his constitutional rights when they (1) entered his home without a warrant; (2) arrested him without probable cause; (3) intentionally omitted exculpatory information from the probable cause report that was submitted to the judge to continue his detention; and (4) confined him for an unreasonable amount of time before bringing him before a judge. (Am. Compl. at 5-6.) The amended complaint also added a claim against Nannette Hegerty, the Chief of Police for the Milwaukee Police Department, alleging that the Department has a *de facto* unwritten policy of allowing police officers

---

[1]Chief Hegerty's name was misspelled in the amended complaint. I have corrected the misspelling above and direct that the clerk enter the correct spelling of Chief Hegerty's name in the docket.

to make warrantless arrests of suspects in their homes on suspicion of any crime involving a firearm. (*Id.* at 7.)

The defendants initially filed a motion to dismiss pursuant to Rule 12(b)(6) on the ground that Flores' claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) (holding that § 1983 may not be used to assert claims that, if successful, would necessarily imply the invalidity of a conviction that has not been reversed or otherwise set aside). The defendants also argued that Flores' claims were barred under the doctrine of claim preclusion. In a decision and order entered on December 14, 2006, I concluded that *Heck v. Humphrey* did not bar Flores' claims and that the record, as it then stood, did not allow a determination that they were barred by the previous state proceedings. I therefore denied the defendants' motion to dismiss. The case is now before me on cross motions for summary judgment. For the reasons that follow, the plaintiff's motion for summary judgment will be denied, and the defendant's motion for summary judgment will be granted.

**BACKGROUND**

In early 2001, defendant David Klabunde, a detective with the Milwaukee Police Department, was investigating of a series of three armed robberies that had taken place on Orchard Street, Muskego Avenue, and National Avenue in the City of Milwaukee during the month of December 2000. The Muskego Avenue robbery had resulted in a double homicide of a young couple that lived at the residence. In the course of his investigation, Detective Klabunde conducted several interviews with one Roberto Velez between February 18 and February 22, 2001. Velez, with whom Klabunde had worked on previous investigations, including one in which he was the

2

victim of an attempted homicide, implicated Flores, whose nickname was "Speedy," and one Miguel Hireheta, who was called "Two-Pack," in the Orchard Street and National Avenue robberies. Velez was also subjected to a polygraph examination, however, and the examiner recorded "definite indications of lying when Mr. Velez answered the four below pertinent listed questions." (Aff. of Kurt J. Sutter, App. at 1.) The four questions referred to and Velez' answers were:

> (1) Do you know for sure that "Topak" and "Speedy" robbed the drug house on 23rd & Orchard? Answer: <u>Yes</u>.
>
> (2) Did you rob that drug house on 23rd and Orchard? Answer: <u>No</u>.
>
> (3) Did you hear any shots fired during the robbery of that drug house on 23rd and Orchard? Answer: <u>No</u>.
>
> (4) Did you later receive any of the stolen property from that drug house? Answer: <u>No</u>.

(Sutter Aff., App. at 1-2.)

Notwithstanding the opinion of the polygraph examiner, and based on his previous involvement with Velez, and the fact that he implicated himself in certain other crimes in the course of the interviews, Klabunde believed Velez' information truthful. In addition, Jimmy Hogestyn, another individual interviewed by detectives in the course of their investigation, had also implicated Flores in one of the robberies. (DPFOF ¶ 15.) Based on the information provided by Velez, Detectives Kurt Sutter and Alfredo Gutierrez of the Milwaukee Police Department were instructed to arrest Flores for the Orchard Street and National Avenue robberies. On February 23, 2001, at approximately 10:00 a.m., Detectives Sutter and Gutierrez, accompanied by two uniformed Milwaukee police officers, namely Terry Trevarthen and Gilberto Collado, proceeded to Flores' home to effect the arrest. (DPFOF ¶¶ 19-23.)

3

The parties dispute the facts surrounding Flores' arrest. The defendants claim that Michel Suarez, Flores' girlfriend, allowed the detectives into the residence, which she shared with Flores, and Flores was taken into custody without incident as he came out of the bathroom. (DPFOF ¶¶ 25-34.) Flores contends the entry was made without consent, and although Suarez testified in the state criminal proceedings that she told the officers they could come in (DPFOF ¶ 27), Flores has filed an affidavit by Suarez in opposition to defendants' motion in which she states that the entry by police was made without her consent. (Doc. # 61.) In any event, once he was taken into custody, Flores was taken to the police administration building, booked and placed in a cell.

From 7:00 p.m. until 11:40 p.m. that night, Flores was interviewed by homicide detectives in an interrogation room. He denied any knowledge of the crimes they were investigating and refused to sign any acknowledgment or statement. (DPFOF ¶¶ 39-41.) Flores was returned to the interrogation room at 3:15 in the early morning hours of Saturday, February 24, and remained there until 5:35 a.m. while a detective reviewed the file. He was taken back to his cell in the police administration building without being questioned after he told the detectives he was too tired to be interviewed. (DPFOF ¶ 43.) Later that day, at approximately 1:15 p.m., Detective Klabunde faxed a probable cause determination (PCD) request to Milwaukee Circuit Court Judge M. Joseph Donald, seeking to maintain Flores in police custody. (DPFOF ¶ 44.) The report briefly recounted the facts of the National Avenue and Orchard Street robberies, and then stated:

> Detectives had occasion to interview Roberto Velez, H/M, 1-28-78 who admitted to his involvement in 1515 West National. He named Flores as the co-actor in the offense and West Orchard.

(Aug. 11, 2006 Aff. of Miriam R. Horowitz, Ex. D, App. 3.) Judge Joseph Donald signed the report indicating a finding of probable cause and directing that Flores be held in custody pending further proceedings. (*Id.*)

4

Between 6:13 p.m. and 8:33 p.m. on February 24, Flores was shown in line-ups relating to the two robberies for which he had been arrested. (DPFOF ¶ 45.) Although Flores was not identified as a participant in either crime, detectives resumed interrogating him between 10:54 p.m. on February 24 and continued until 12:09 a.m. on Sunday, February 25 regarding those robberies, as well as the double homicide involving the young couple that had occurred at 2130 South Muskego Avenue. Although Flores had not been identified in connection with the double homicide, police suspected that it was linked to the Orchard Street robbery because a bullet found there matched one found at the homicide scene. (DPFOF ¶¶ 46-50.)

During this time, police were also interrogating Miguel Hirecheta concerning some or all of the same crimes. Hirecheta eventually told detectives that Flores was the person who shot and killed the young couple on South Muskego Avenue. At 2:13 a.m. on Februray 25, Flores was brought back to the interrogation room and confronted with Hirecheta's statement. At that point, Flores confessed to his involvement in an attempted robbery at the South Muskego address, but claimed that his accomplices had shot the couple. Flores also confessed to two other burglaries police were investigating, one on West Lapham Boulevard and another on East Capitol Drive. The interview ended at 9:56 a.m. on Sunday, February 25, 2001. Later that day, Flores showed the detectives the location where pieces of the firearm used in the double homicide had been dropped from a bridge. With Flores' consent, detectives also retrieved from his home a VCR taken from the residence on South Muskego where the double homicide had taken place. (DPFOF ¶¶ 52-56.)

At 8:04 p.m. on February 25, Flores was transported to the Milwaukee County Criminal Justice Facility (CJF), and his custody was transferred to officers of the Milwaukee County Sheriff's Department which administers the CJF. (DPFOF ¶ 57-58.) On February 27, 2001, a criminal

5

complaint was issued charging Flores with two counts of felony murder based on the double homicide at the South Muskego address and the two burglaries to which he had confessed.[2] (Horwitz Aff., Ex. B.) The complaint was filed the following day, and on March 1, 2001, Flores was brought before a judge for his initial appearance on the charges. (Horwitz Aff., Ex. A.) Flores eventually pleaded "no contest" to the felony murder counts as a party to the crime, in return for which two related burglary counts were read in and dismissed. On February 1, 2001, Flores was sentenced to twenty-five years with an initial confinement term of thirteen years, to be followed by twenty years of probation. (Horwitz Aff., Ex. C.)

**ANALYSIS**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the non-movant. *Feldman v. American Mem. Life Ins. Co.*, 196 F.3d 783, 789 (7th Cir. 1999). The mere existence of a factual dispute does not defeat a summary judgment motion; rather, there must be some genuine issue of material fact in the case for it to survive. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). With this standard in mind, I now turn to the claims Flores has asserted.

---

[2]The State never pursued charges against Flores for the Orchard Street and National Avenue robberies on which he was arrested. (Horwitz Aff., Ex. F. at 3, n.3.)

**A. Probable Cause to Arrest and Detain**

For his First and Second Causes of Action, Flores claims that the arresting officers violated his Fourth Amendment rights by arresting him and causing his continued detention without probable cause. In support of these claims, Flores contends that notwithstanding Velez' statement implicating him in the Orchard Street and National Avenue robberies, probable cause was lacking because a polygraph examiner had found Velez to be untruthful and because the information Velez provided was inconsistent with other evidence police had obtained concerning those robberies in the course of their investigation. When this additional information is considered, Flores maintains, Velez' statements implicating him in the robberies does not amount to probable cause. Moreover, by failing to disclose this additional and exculpatory evidence to Judge Donald when they sought a judicial determination of probable cause in order to continue his detention, Flores contends that the defendants unconstitutionally prolonged his detention without probable cause.

In response, defendants have asserted the defense of qualified immunity which, if established, would shield them from suit. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). In *Saucier*, the Supreme Court established a two-part test for resolving the issue of qualified immunity. Under this test, the court first determines whether the facts alleged, considered in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. If the court so finds, it then considers whether the constitutional right violated was firmly established at the time of the alleged injury, such that a reasonable officer would understand that his actions are in violation of that right. *Id.*; *see also Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

7

Turning to the first part of the test, the question presented in this case is whether the officers responsible for Flores' arrest and continued detention violated his Fourth Amendment rights by causing him to be arrested and his detention continued without probable cause. *Mannoia*, 476 F.3d at 457. In assessing this issue, it is important to note that "[p]robable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp v. City of Noblesville,* 320 F.3d 733, 743 (7th Cir. 2003) (*citing Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)). "Probable cause exists at the time of arrest when reasonably trustworthy information, facts and circumstances would lead a prudent person to believe that a suspect had committed or was committing a crime." *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000). In deciding whether information upon which an arresting officer relies was sufficient to establish probable cause, the court must look only at what the officer knew at the time of the arrest, not at how things turned out in hindsight. *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994). "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp*, 320 F.3d at 743 (*citing Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2001)). "And in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Id.* (*citing Spiegel v. Cortese*, 196 F.3d 717, 724-25 (7th Cir. 2000)).

In this case, two individuals interviewed by police, Velez and Hogestyn, provided information that identified Mr. Flores as the person who committed the Orchard Street robbery under investigation. In addition, Velez implicated himself, as well as Flores, in the National

8

Avenue robbery. Flores contends that this information was not sufficiently credible to constitute probable cause for his arrest. He notes that Hogestyn's identification was based on what he claimed he had heard from yet another person, "Trevino". But when police then interviewed Trevino, he identified two other people as the perpetrators of the Orchard Street robbery. As to Velez, Flores notes that the polygraph examiner found "definite indications of lying" when he was asked about his knowledge of the Orchard Street robbery and his own involvement. And the information Velez provided about the National Avenue robbery, Flores contends, was contradicted by information police obtained in the course of their own investigation of the crime. More specifically, Flores notes that Velez told police that he acted as a lookout while Flores attempted to rob the victim but that nothing was taken. But according to the police reports relating to that offense, witnesses mentioned only one perpetrator and reported that over $10,000 worth of jewelry was stolen. In light of this additional information, Flores claims that the statements of Velez and Hogestyn did not establish probable cause. And because they failed to disclose the exculpatory information to Judge Donald, Flores contends that his finding of probable cause affords the defendants no protection.

As an initial matter, it should be noted that police did not rely on the information provided by Hogestyn in deciding to arrest Flores; nor was that information provided to Judge Donald as part of the probable cause showing when the request was made that his detention be extended. The fact that Hogestyn's identification of Flores as one of the Orchard Street robbers was fatally undermined by Trevino, the person from whom Hogestyn claimed he obtained the information, is therefore irrelevant. The crucial issue is whether police were justified in relying on the information provided by Velez. It was Velez who claimed to have personal knowledge of the crimes and who identified Flores as one of the perpetrators of both the Orchard Street and the National Avenue robberies.

9

Despite the opinion of the polygraph examiner that Velez was untruthful in certain of his statements, police were justified in relying on the information he provided to find probable cause for Flores' arrest and continued detention. While police may regard polygraphs as an important tool in their investigation of certain crimes, it should be noted that polygraph results are not admissible as evidence in most courts, including federal courts and those of the State of Wisconsin. Thus, the fact that Velez may have failed a polygraph examination would not prevent the use of his testimony at trial to secure a conviction. If his testimony would have been sufficient to support a conviction, it necessarily follows that it was enough to establish probable cause. *See State v. Marshall*, 284 N.W.2d 592, 597-98 (Wis. 1979) (holding that failed polygraph test does not vitiate otherwise proper showing of probable cause).

But even aside from the questionable reliability of polygraph testing, police had additional reasons for discounting such evidence in this case and believing Velez was truthful. Detective Klabunde, who interviewed Velez, had worked with him in the past on other criminal investigations, including one in which Velez had been the victim of an attempted homicide, and believed that Velez had provided truthful information to him on those previous occasions. Moreover, in his statements concerning the robberies under investigation, Velez implicated not only Flores, but himself as well. This, too, led Detective Klabunde to believe that Velez' account was credible. (May 9, 2006 Aff. of Lt. David Klabunde ¶¶ 6-9.) Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility-sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971). Klabunde also states in his affidavit that he spoke further with Velez after the polygraph test and Velez admitted to him that he had planned on committing the Orchard Street robbery, but before he could do so, Flores and Two-Pack

10

had robbed the place. (June 6, 2007 Aff. of Lt. David R. Klabunde ¶¶ 4-5.) Detective Klabunde states that he then discussed the results of Velez' polygraph test with the examiner and was told that the fact that Velez had intended to commit the crime himself likely affected his response to the related polygraph questions, and Velez' response may well have been truthful even though they had the appearance of being untruthful. (*Id*. ¶¶ 5-7.) Given these facts, Klabunde was justified in concluding that despite the results of the polygraph test, Velez was reliable.

Flores' argument that Velez' statements about the National Avenue robbery were blatantly inconsistent with the information police had learned in their investigation of that crime is also overstated. Despite Flores' conclusory allegation that victim reports "completely contradict" the statements of Velez, close comparison of the two shows this is not true. Velez stated that he was a "lookout" for the robbery and that Flores was the "shooter". This is not necessarily contradictory to the witnesses' statements that they only observed one person committing the crime. As a "lookout", Velez would not have an active role in the commission of the robbery, and therefore it may only appear to a witness that only one person is committing the crime. And the fact that the victim told police that $10,000 worth of jewelry was taken whereas Velez claimed that they left with nothing is hardly a basis for concluding that Velez' account was false. From his role as a lookout, Velez may not have been in a position to see what was taken. But even if he was, victims are not always truthful in their account of property taken in a crime. Police were not required to discount Velez' version of the event simply because it was not fully consistent with all of the information they had been given by others.

Finally, it is also important to consider the nature of the crimes that were under investigation. Police were investigating a series of armed robberies. All three involved the discharge of firearms,

11

and although there were no injuries in the Orchard Street robbery, a man was shot and seriously injured in the National Avenue incident and a young couple were shot and killed in the course of the Muskego Avenue incident. In view of the threat to public safety the perpetrators of these crimes posed, it was reasonable for police to act quickly when credible evidence came to light indicating who was involved. As the Supreme Court has observed, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (*quoting Terry v. Ohio*, 392 U.S. 1, 19 (1968)). In any assessment of police conduct, the nature of the crime under investigation certainly matters. If the crimes under investigation had been less violent, Flores' argument that police should have awaited further corroboration before arresting him might make more sense. But faced with a spree of robberies with two people dead and another seriously wounded, police cannot be faulted for moving quickly. What was required, after all, was probable cause, not proof beyond a reasonable doubt. And based on the information provided by Velez, probable cause was established.

I therefore conclude that police did not violate Flores' Fourth Amendment rights by arresting him and causing his continued detention without probable cause. Neither the results of the polygraph test Velez was subjected to, nor the additional information obtained in their investigation, so undermined the credibility of his statements implicating Flores in two of the robberies under investigation such that probable cause was lacking. It therefore follows that Flores' arrest was lawful. It necessarily follows that the failure to include the polygraph results and other information in the report faxed to Judge Donald in order to obtain a judicial determination of probable cause determination and authorization to continue his detention did not violate Flores' rights either. Since

12

the additional information would not have prevented a finding of probable cause, there was no duty to include it. Accordingly, summary judgment will be granted as to Flores' first and second claims.

**B. Unlawful Entry**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., Amdt. 4. The Supreme Court has interpreted this language to prohibit law enforcement officers from entering an individual's home or dwelling without a warrant in all but exceptional cases. *Payton v. New York*, 445 U.S. 573, 586 (1980). For his Third Cause of Action, Flores claims that Detectives Sutter and Gutierrez, and Officers Trevarthen and Collado violated his rights under the Fourth Amendment when they entered his residence on February 23, 2001, without a warrant to effect his arrest.[3] Defendants claim in response, however, that they were given consent by Michel Suarez, Flores' girlfriend/fiancé, who lived at the same address.

If in fact the defendant officers did have Ms. Suarez' consent, their entry would not constitute a violation of Flores' Fourth Amendment rights. *See United States v. Matlock*, 415 U.S. 164, 170 (1974) ("[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."); *see also Randolph v. Georgia*, 547 U.S. 103, 112 (2006). In this case, the record conclusively establishes,

---

[3]The record reflects that Defendant Trevarthen, who has since retired from the Milwaukee Police Department, has not been served with a summons and amended complaint in this matter. The court therefore lacks personal jurisdiction over Trevarthen, and all claims against him must be dismissed. *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 925-26 (2007). Given Flores' pro se status, the court would be inclined to direct service upon Trevarthen even at this late date if there appeared any merit to the claim against him. *See* Fed. R. Civ. P. 4(c)(2). Since I find no merit to Flores' claim of unlawful entry in any event, however, I decline to prolong this litigation by directing service at this time.

13

for purposes of summary judgment, that at the time police arrived at the residence, Flores was in the bathroom and Suarez did in fact consent to their entry.

The defendants' motion is supported by the affidavit of Detective Sutter, in which he states unequivocally that "Ms. Suarez allowed the detectives to enter the residence, and she affirmatively told them that they could come in. (Sutter Aff. ¶ 12.) The affidavit goes on to state that Flores was later observed by the detectives as he emerged from the bathroom. He was immediately taken into custody, allowed to dress and transported to the Police Administration Building. (Sutter Aff. ¶¶ 31-36.) Based upon this evidence, then, it would appear that Flores was not in a position to object to the officers' entry, since he was in the bathroom, and Suarez, who had joint control of the premises, consented.

Flores has attempted to counter the defendants' evidence with a declaration, *see* 28 U.S.C. § 1746, purportedly signed by Suarez in which she states that she did not give consent to the officers' entry. (Doc. # 77.) But Suarez' declaration directly contradicts her sworn testimony given at a hearing on a motion to suppress Flores' confession in the state criminal proceedings, Suarez was specifically asked at the hearing about the police entry on the morning of February 23:

> Q   The police came to your door on February – do you remember the date being February 23?
> A   Yes.
> Q   And they ask you who Robert Flores is; is that correct?
> A   Yes.
> Q   And you tell them you don't know Robert Flores or he's not there; is that correct?
> A   I did not tell them that.
> Q   What did you do?
> A   I just hold my head down, like I said before.

14

| | | |
|---|---|---|
| Q | | And you invited them in? |
| A | | They just came in. I didn't invite. |
| Q | | Did you tell them they could come in? |
| A | | Yes. |
| Q | | And then the police came in; is that correct? |
| A | | Yes, sir. |

(Horowitz Aff., Ex. H at 209-10.)

The Seventh Circuit has long recognized hat summary judgment would be meaningless if litigants could manufacture genuine issues of material fact through self-serving and unsupported "admissions" materially different from positions taken in the past. *U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 466 (7th Cir. 2005). For this reason, courts do not countenance the use of so-called "sham affidavits," which contradict prior sworn testimony, to defeat summary judgment. *See, e.g., Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) ("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions. . . . If such contradictions were permitted, . . . 'the very purpose of the summary judgment motion-to weed out unfounded claims, specious denials, and sham defenses-would be severely undercut.' ") (internal citations omitted) (collecting authority). This is not to say that a declaration or affidavit that contradicts prior testimony can never create an issue of fact. A contradictory affidavit may be allowed when it is used to clarify ambiguous or confusing testimony, or when it is based on newly discovered evidence. *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1171-1172 (1996). Such an affidavit or declaration may also be considered where evidence is offered to show that the prior statement "was mistaken, perhaps because the

15

question was phrased in a confusing manner or because lapse of memory is in the circumstances a plausible explanation for the disparity." *Cowan v. Prudential Ins. Co. of America,* 141 F.3d 751, 756 (1998).

Flores has made no such showing here, however. Suarez' testimony at the hearing on Flores' motion to suppress his statements was clear. Although she denied that she invited the officers into the residence, she testified unequivocally that she told them they could come in, apparently in response to their request. This is clearly enough to establish that the entry was consensual, and neither Suarez, nor Flores, offer any explanation why Suarez would have so testified if it was not true. The question was not confusing, and from a reading of the transcript, it is clear that Suarez was not unduly influenced or intimidated by the police. She was called as a witness to support Flores' claim that the police had violated his rights under *Miranda*, and she did so by testifying that despite his repeated requests for an attorney, the detectives persisted in their interrogation of him. (Horowitz Aff., Ex. H at 198.) No explanation is offered as to why her recollection of the events of that morning given more than six years later in a declaration offered to in support of Flores' civil suit against the officers should control over the sworn testimony she offered in the criminal case against him less than a year after the events occurred. In the absence of any explanation for the contradiction, I conclude that Suarez's declaration is entitled to no weight and does not preclude entry of summary judgment in favor of the defendants on this claim. Flores' claim that officers violated his Fourth Amendment rights by illegally entering his residence will therefore be dismissed.

16

**C. Remaining Claims**

Flores' remaining claims are of no merit and require little discussion. He concedes that the defendants, as City of Milwaukee employees, are not responsible for the delay in taking him before a judge after his custody was transferred to the CJF which is operated by the County Sheriff Department. (Pl.'s Br. in Opp. at 2.) Therefore, Count IV of Flores' amended complaint must be dismissed. None of the defendants are responsible for the failure of County Government Officials to bring Flores before a judge once he was turned over to the jail.

Flores' final claim is that Nannette Hegerty, the former Milwaukee Police Chief, maintained an unconstitutional policy of allowing officers to make warrantless arrests of suspects in their home on suspicions of crimes which involved the use of firearms. This claim fails for a number of reasons. First, it fails because Nannette Hegerty was not the police chief until two years after Flores' arrest. She could hardly have been responsible for the policy in effect at that time. Even aside from this problem, however, the claim is wholly without merit. Flores bases his claim on his conclusory allegations that the policy in place for the procedure of making warrantless arrests in crimes involving firearms is unconstitutional. Flores claims that such a rule or practice is in violation of the "Warrant Requirement Clause" as announced in *Johnson v. United States*. 33 U.S. 10, 13-14 (1948). Flores cites a general rule outlined in *Johnson* that a warrant is usually necessary to enter a home because law enforcers may lack sufficient objectivity to evaluate the evidence. *Id.*

Flores appears confused as to what the law requires. Police may lawfully enter a home to make an arrest even without a warrant when, as in this case, they have the consent of a person with authority to provide such consent, or if exigent circumstances exist. *Sparing v. Village of Olympia*

17

*Fields,* 266 F.3d, 684, 688 (7th Cir. 2001). As already noted, his rights were not violated in this case when he was arrested by Milwaukee police officers and taken into custody. He has offered no evidence of any unconstitutional policy or custom on the part of the City, its police department or its chief. Accordingly, this claim, too, will be dismissed.

**CONCLUSION**

For the reasons set forth above, none of Flores' claims survive summary judgment. He has failed to rebut the defendants' showing that he was lawfully arrested in his home on February 23, 2001, and continued in custody over the weekend when he confessed to his involvement in a robbery in which a young couple was shot and killed. He has also failed to establish that the City maintained an unconstitutional policy concerning the arrest of individuals for offenses involving firearms. The defendants' motion for summary judgment is therefore **GRANTED**, and this action is **DISMISSED** on its merits and with prejudice.

**SO ORDERED** this   12th   day of January, 2008.

                                       s/ William C. Griesbach
                                       William C. Griesbach
                                       United States District Judge